UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEN TOSCANO,<br><br>    Plaintiff,<br><br>  v.<br><br>G. EMBREE, et al.,<br><br>    Defendants.<br>_____ / | No. C 05-4113 SI (pr)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Ben Toscano, a prisoner of the State of California, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 in the Eastern District of California on June 21, 2000. More than five years later, the action was transferred to the Northern District of California. The stated reason for the transfer was that, due to dismissal of several defendants and claims concerning medical care while Toscano was housed at the state prison in Corcoran, the only remaining defendant was a doctor at Pelican Bay State Prison and the only remaining claim concerned medical care while Toscano was housed at Pelican Bay. At the time the action was transferred to this district, the remaining defendant (Dr. Winslow) had filed a motion for summary judgment that was fully briefed. In the order transferring this action to the Northern District, the transferring court denied defendant's pending motion for summary judgment filed January 28, 2005 without prejudice. This court thereafter notified the parties of its intent to revive that fully-briefed motion and decide it. Neither party objected to the procedure.

Toscano claims that Dr. Dwight Winslow was deliberately indifferent to Toscano's thumb injury. Dr. Winslow has moved for summary judgment on the grounds that no triable issue of

material fact exists on Toscano's claim and that qualified immunity protects Dr. Winslow from liability for the acts alleged in the complaint. For the reasons discussed below, the motion for summary judgment will be granted.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

Toscano injured his left thumb on May 2, 1999, during a fight with another inmate at the state prison in Corcoran.[1] Although he obtained medical care after the fight and a cast was applied on May 4, 1999, he was displeased with the care and began complaining within days. See Motion In Opposition To Defendant's Motion For Summary Judgment, Exh. H. He filed an inmate appeal on May 7 – five days after the incident – citing a Supreme Court case on deliberate indifference to medical needs and demanding "to be immediately treated by real outside doctors & not inadequate prison medical staff & doctors." Id. Toscano removed the cast that had been put on his wrist/thumb by the medical care providers, apparently because he did not think it was the right treatment.

Toscano was transferred to Pelican Bay on January 12, 2000, and remains incarcerated at that prison.

Dr. Winslow is and was the Health Care Manager at Pelican Bay. His duties include supervising Pelican Bay's medical services department and reviewing inmate appeals. Dr. Winslow was not Toscano's treating physician.

Upon Toscano's arrival at Pelican Bay, medical staff examined and referred him for an orthopedic consultation. On March 23, 2000, medical staff called the orthopedic clinic and scheduled an appointment for Toscano in April of 2000.

---

[1] The May 1999 injury was not the first time Toscano's thumb had been injured. His prison records include a medical report dated February 24, 1995 noting a swollen left thumb and other hand injuries after a cell fight, an April 15, 1996 medical report noting a superficial laceration to his left thumb, and a June 5, 1998 medical report noting a possible fracture and laceration to the left thumb during a yard fight. See Wolff Decl., Exhs. D, E, G, I. The 1998 injury was surgically repaired in June 1998. Toscano points out that his thumb had not been fractured in any but the 1998 injury.

2

On April 26, 2000, Drs. Lau and Duncan saw Toscano.[2] Winslow Decl., ¶ 14. Toscano states that during this visit Dr. Duncan informed him that his injuries were permanent and required surgery. Toscano's Depo., RT 42:4-8. Toscano testified that Dr. Duncan prescribed a splint for use prior to surgery. Id. at 42:4-43:8. Dr. Lau's orthopedic consultation report from the visit did not state that surgery was required and instead indicated that a more conservative approach would be tried first. Dr. Lau wrote: "At this late stage, the patient will probably end up with chronic instability and arthritis of the first CMC joint. Dr. Duncan had seen the patient and advised using a thumb spica-type of wrap for support. Eventually, he may require a fusion of the first CMC joint. He will return for follow-up if his symptoms become worse." Winslow Decl., Exh. G. A medical chrono (i.e. permission slip) allowing Toscano to use an ACE wrap for one year was issued. See Winslow Decl., Exh. I.

On June 1, 2000, Toscano was seen by a physician and complained that his thumb hurt, that he never received a spica splint, and that he wanted a second opinion. The physician noted that Toscano's thumb was stable and did not provide a prescription due to Toscano's pending inmate grievance decision. Decl. Winslow, ¶ 17. On June 5, 2000, Toscano was again seen by a physician. He complained of pain in his left hand and requested surgery. Id. at ¶ 18.

On June 16, 2000, Toscano filed his complaint in this action.

On June 23, 2000, Steven Fama, plaintiffs' class counsel in Madrid v. Gomez, Case No. C 90-3094 TEH, sent a letter to the Attorney General's Office, which was then forwarded to Pelican Bay. The letter stated that Toscano did not receive his "spica-type wrap" and requested that surgery be performed. Winslow Decl., Exh. M. On July 17, 2000, Fama sent a letter to Toscano stating that Fama spoke via phone with Dr. Winslow on July 7, 2000, and that Dr. Winslow, after talking with Dr. Duncan on July 6, 2000, stated that Drs. Duncan and Lau "think surgery should be done." Winslow Decl., Exh. N.

---

[2] Doctors Mark M. Lau and Gregory J. Duncan are in a joint private medical practice in Crescent City, California and are orthopedists contracted by Pelican Bay to provide medical care to inmates. Decl. Winslow ¶ 13.

3

On July 26, 2000, Toscano saw Dr. Lau for another orthopedic consultation. Dr. Lau noted that Toscano was not fitted with a splint and recommended that Toscano "be given a chrono for a thumb spica splint. I do not recommend operative treatment at this time. He will return as needed if the symptoms become worse." Winslow Decl., Exh. O. A medical chrono for a spica splint for one year was issued that day. Id. at Exh. I. Progress notes showed that Toscano was scheduled for a two-week follow-up. Id. at Exh. Q.

On August 1, 2000, Dr. Winslow issued the Second Level Response to Toscano's Inmate Appeal No. PBSP-S-00-00947, originally filed on March 14, 2000.[3] Winslow Decl., Exh. R. Dr. Winslow recited Toscano's medical history and stated that "[s]ince filing this appeal . . . you have been back to see the orthopedist. Your medications have been changed and an ACE wrap has been approved for the care of your thumb. You have been scheduled to be seen by the orthopedist, to further evaluate your thumb." Id. At the follow-up appointment on August 10, 2000, the physician observed that Toscano's thumb was stable. Winslow Decl., Exh. S.

On August 28, 2000, Dr. Winslow issued the Second Level Response to Toscano's Inmate Appeal No. PBSP–S-00-01581, originally filed on June 1, 2000.[4] Winslow Decl., Exh. T. Again, after a review of Toscano's medical history, Dr. Winslow partially granted the appeal but denied Toscano's request for surgery "based on Dr. Lau's assessment that you do not need operative treatment at this time." Id.

Toscano refused to attend a scheduled orthopedic appointment on September 20, 2000.

On February 2, 2001, Dr. Winslow spoke with plaintiffs' class action counsel, Steven Fama, as part of the Madrid compliance program. Dr. Winslow informed counsel that Toscano

---

[3] Toscano's original inmate appeal requested "effective pain medication such as codine [sic]" although it is not clear whether that was for an unrelated back injury or for the thumb injury. Winslow Decl., Exh. R. Toscano also requested "to be seen immediately, to be issued an (ace wrapp) because of the cold whether bring about severe pain to injury hand/thumb. To see 'orthopedics' immediately!!" Id. (errors in source).

[4] Toscano's original inmate appeal requested that the prison staff "provide me with a chrono for (2) mattresses, surgery for my hand & back, provide 'migrain' headache medication." Winslow Decl., Exh. T. Only the hand surgery request is discussed here, as that is the only claim he asserts in this action. Similarly, only the medical care issue is discussed here, as the complaint did not include a claim for retaliation even though Toscano's opposition refers to retaliatory motives for defendant's actions.

4

would be placed on the next orthopedic clinic line.

On February 7, 2001, Toscano saw an orthopedist, who issued a thumb spica splint.

On February 21, 2001, Dr. Duncan saw Toscano and noted that Toscano was "having increasing pain despite full-time use of a thumb spica splint and anti-inflammatory medications." Winslow Decl., Exh. BB. Dr. Duncan recommended surgery to address Toscano's thumb pain. Toscano was informed of the benefits and alternatives to surgical treatment. Id. Dr. Duncan informed Toscano at another visit on March 21, 2001, of the risks of "bleeding, infection, neurovascular injury, nonunion and the expected result of decreased range of motion at the CMC joint as a result of this procedure." Winslow Decl., Exh. FF. Toscano gave his informed consent to the surgery.

Prior to surgery, Toscano had two more follow-up appointments and a radiology report performed.

On April 30, 2001, Dr. Duncan performed surgery on Toscano's left thumb, described as "[a]rthrodesis, left first carpometacarpal joint with 3.0 mm cannulated Synthes screw and 0.45 Kirschner wire with left iliac bone graft." Winslow Decl., Exh JJ.

On May 2, 2001, Toscano's follow-up appointment showed that there was "normal sensation to all the finger tips and no swelling. The left iliac crest incision is healing normally and a new sterile dressing was applied." Winslow Decl., Exh. KK. Progress notes for May 6, 2001, state that Toscano removed a pin from his surgery himself, although Toscano disputes that he did so. On May 8, 2001, Toscano's physician at his follow-up appointment determined that the surgical incisions were healing well, and he issued a chrono permitting Toscano to have a sling for a month. On May 10, 2001, Dr. Duncan saw Toscano for an orthopedic consultation, and noted that the removal of the pin could compromise the healing process. Dr. Duncan placed Toscano in a fiberglass cast, and advised Toscano not to move his wrist nor remove his cast. On May 13, 2001, Toscano removed his cast in his cell.

On May 16, 2001, Dr. Duncan saw Toscano for a follow-up orthopedic consultation and x-ray. The incision had healed and there was no indication of deformity or infection of the thumb. Dr. Duncan provided a new spica splint "and the patient was told once again he may

5

1 develop a non-union as a result of continued non-compliance with the recommendation to protect
2 the thumb with a splint and also his previous removal of the fixation pin." Winslow Decl., ¶ 46;
3 Exhs. § and TT.  Toscano had four more follow-up appointments in May, and physicians
4 continued to evaluate his treatment thereafter.  A December 14, 2001, consultation from U.C.
5 Davis was done and determined that Toscano's "surgery was quite successful." Winslow Decl.,
6 Exh. AAA.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to Toscano's claim occurred at Pelican Bay State Prison in Del Norte County, located in the Northern District. See 28 U.S.C. §§ 84, 1391(b).  This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, as is the situation with Dr. Winslow's challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the

6

nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

Where, as is the situation with Dr. Winslow's qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence that would entitle him to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on each issue material to the affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).

The court's function on a summary judgment motion is not to make credibility determinations nor weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. Id. at 631.

/ / /

/ / /

/ / /

7

**DISCUSSION**

A.   Deliberate Indifference to Medical Needs Claim

Deliberate indifference to a prisoner's serious medical needs amounts to the unnecessary and wanton infliction of pain prohibited by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). Accordingly, evaluating a claim of deliberate indifference necessitates examining "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id. (quoting Estelle, 429 U.S. at 104). A prison official exhibits deliberate indifference when he or she knows of and disregards a substantial risk of serious harm to inmate health. See Farmer, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he or she must actually draw that inference. Id. A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989). Where doctors have chosen one course of action and a prisoner-plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.), cert. denied, 519 U.S. 1029 (1996) (internal citations omitted).

Dr. Winslow does not dispute that Toscano's broken thumb was an objectively serious medical problem in need of care. Instead, he focuses on the mental state required for an Eighth

Amendment claim, arguing that there is an absence of evidence that he acted with deliberate indifference.

Toscano has not established a triable issue of fact that Dr. Winslow was deliberately indifferent to Toscano's thumb injury. Beginning soon after his arrival at Pelican Bay and continuing well after surgery, Toscano was frequently seen by orthopedists Drs. Duncan and Lau and prison medical staff. Drs. Duncan and Lau ordered a spica-type wrap for Toscano's thumb, and issued medical chronos for use of the wrap. Dr. Winslow denied Toscano's requests for surgery in August 2000 in light of Drs. Duncan and Lau's recommendations for conservative treatment. Dr. Winslow made these determinations after reviewing Toscano's medical history and examining the recommendations of Toscano's treating physicians and orthopedists. The first written report from the orthopedic specialists in which surgery was recommended was not done until February 21, 2001. Toscano argues that Dr. Duncan's report of April 26, 2000 said he "will" require surgery, but the report itself says only that he "may" require surgery. Compare, First Amended Complaint, p. 5 with id. at unnumbered exhibit, Orthopedic Consultation dated April 26, 2000. Toscano cannot create a triable issue of fact by simply misrepresenting the contents of a document, as the court need not credit a party's version of the facts that is "blatantly contradicted by the record." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007). On March 21, 2001, when conservative treatment failed to resolve Toscano's symptoms, surgery was recommended, Toscano consented to surgery, underwent the operation within a month, and received follow-up care.

Toscano's assertion that surgery was recommended in conversation on his April 26, 2000 visit to Drs. Lau and Duncan is insufficient to establish deliberate indifference on the part of Dr. Winslow because the written report available to Dr. Winslow did not recommend surgery at that time and only noted the possibility of surgery in the future if Toscano's condition worsened, and recommended conservative treatment via a spica-type wrap. Toscano has not provided any evidence that the conservative care course first tried by the orthopedists was medically unacceptable. Conservative treatment, if successful, would have avoided the risks associated with surgery, including "bleeding, infection, neurovascular injury, nonunion and the expected

result of decreased range of motion at the CMC joint as a result of [such a] procedure." Winslow Decl., Exh. FF. Conservative treatment also would avoid the risks created by a non-compliant surgical patient – as Toscano turned out to be when he removed a cast after surgery and may have removed a pin after surgery. (He also had removed a cast when it was initially applied in May 1999 shortly after the injury occurred because he decided it was not the right treatment. First Amended Complaint, p. 3b.)

Further, although attorney Fama's second letter represented that Dr. Winslow told Fama that as of July 6, 2000, Drs. Duncan and Lau believed Toscano should undergo surgery, this hearsay evidence is insufficient to show a triable issue of fact. The written orthopedic consultation notes recommended conservative treatment until 2001, when surgery was actually performed. Dr. Lau's Orthopedic Consultation Notes for July 26, 2000, stated: "I do not recommended operative treatment at this time. He will return as needed if the symptoms become worse." Winslow Decl., Exh. O. Dr. Winslow, as health care manager, reasonably relied on the professional opinions of orthopedists Drs. Duncan and Lau, especially since he was not Toscano's treating physician and they were specialists. Consequently, Dr. Winslow did not demonstrate deliberate indifference by denying Toscano's surgery in his August 1, 2000 and August 28, 2000 responses to Toscano's inmate appeals.

Toscano's personal disagreement with the decisions by prison medical authorities is insufficient to establish deliberate indifference for an Eighth Amendment claim. Toscano's subjective belief that surgery should have been performed earlier or was needlessly delayed does not prove that Dr. Winslow acted with deliberate indifference. He has not met his burden of providing evidence from which a reasonable jury could conclude that "the course of treatment the doctors chose was medically unacceptable under the circumstances," or that the doctors "chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d at 332. Toscano has not provided any evidence that all thumb injuries require surgery – immediately or ever. Nor has he shown that the treatment doctors provided him was medically unacceptable. He has not indicated that he has any medical training or that he is competent to speak to the proper care for an injured thumb. Likewise, he has not shown his

10

competency to opine that any degenerative bone disease he had was caused by the delay in operating on it. Nor has he shown any factual basis for his speculation that the surgery would have been different if it had been done sooner, e.g., that a bone graft or screw fixation would not have been required.

When the evidence is viewed in the light most favorable to Toscano, and inferences therefrom drawn in his favor, the evidence shows at most a disagreement between Toscano and the prison's medical staff and outside orthopedists concerning the best course of care for his thumb injury. A difference of opinion as to which of several medically acceptable courses of treatment should be followed -- such as the difference that existed here, even if one assumes that Toscano could develop evidence that surgery also would have been appropriate immediately without any effort at conservative treatment -- is insufficient as a matter of law to establish deliberate indifference.

B.    Qualified Immunity

The defense of qualified immunity protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" Burns v. Reed, 500 U.S. 478, 495 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court considers whether "in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If not, the inquiry ends, and the defendant prevails. See id. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. To be clearly established, it must "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202.

The first step under <u>Saucier</u> is to determine whether a constitutional violation was alleged. As discussed above, the evidence in the record does not establish an Eighth Amendment violation. Dr. Winslow met his burden of proof in his moving papers, and Toscano did not overcome it by setting forth specific facts showing the existence of a genuine issue of fact on the defense. Accordingly, there is no need to proceed to the second step under <u>Saucier</u>. Dr. Winslow is entitled to judgment as a matter of law on his qualified immunity defense.

## CONCLUSION

For the foregoing reasons, Dr. Winslow's motion for summary judgment is GRANTED. Dr. Winslow is entitled to judgment as a matter of law on the merits of the Eighth Amendment claim and on his qualified immunity defense. Judgment will be entered in all defendants' favor and against Toscano. The clerk will close the file.

Dated: September 19, 2007

SUSAN ILLSTON
United States District Judge